**McGuireWoods LLP**
1345 Avenue of the Americas
Seventh Floor
New York, NY 10105-0106
Phone: 212.548.2100
Fax: 212.548.2150
www.mcguirewoods.com

Marshall Beil
Direct: 212.548.7004

**McGUIREWOODS**

mbeil@mcguirewoods.com
Fax: 212.715.2319

December 10, 2013                                                                                      **Via ECF and Email**

Honorable Katherine Polk Failla, United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

*Eastman Chemical Co. v. Nestlé Waters Management & Technology*
S.D.N.Y., 11-cv-2589 (KPF) (HBP)

Dear Judge Failla:

Plaintiff Eastman Chemical Company ("Eastman") respectfully submits, pursuant to Your Honor's November 12, 2013 Order, this pre-motion letter describing its proposed motion for partial summary judgment on liability (i) granting Eastman's Count III and (ii) dismissing Nestlé's counterclaims.

**Eastman's Count III – Nestlé's Failure to Purchase Any ParaStar® 2800**
This case involves defendant Nestlé Waters Management & Technology's ("Nestlé") breach of two successive multi-year agreements (the First and Second Contracts) for the supply of various PET resins used to make bottles, five gallon jugs and ovenable trays. Count III of Eastman's amended complaint relates to Nestlé's obligations under the Second Contract to purchase ParaStar® 2800 used to make ovenable trays for prepared food.

Under the Second Contract, Nestlé was required to purchase at least 24,000,000 pounds of ParaStar 2800 in 2010. Nestlé bought none. Eastman produced ParaStar 2800 that met the contractual specifications during 2010 and sold and shipped millions of pounds to other customers, including Mullinix, which used the product to make ovenable trays for Nestlé's products. (Mullinix's purchases do not count under the Eastman-Nestlé supply contract.)

Nestlé's principal defense is that its obligation to purchase was conditioned on "qualification" of ParaStar 2800, not by Nestlé, but by Nestlé's principal converter, APT, the company that manufactured most of Nestlé's trays (Nestlé had previously qualified ParaStar 2800 for use by Mullinex). Although there are no contemporaneous documents in either party's files supporting this defense, Nestlé's witnesses and one expert testified that under industry standards, custom and practice, qualification, defined variously depending upon the witness, is a precondition to every chemical supply contract. This defense is deficient as a matter of law.

No language requiring qualification as a precondition to Nestlé's obligation to purchase 2800 appears anywhere in the Second Contract. The absence of *any* "qualification" language is fatal to Nestlé's defense. New York law, which the parties chose as the governing law, is clear: "it is well settled that extrinsic evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990).

Atlanta | Austin | Baltimore | Brussels | Charlotte | Charlottesville | Chicago | Houston | Jacksonville | London
Los Angeles | New York | Norfolk | Pittsburgh | Raleigh | Richmond | Tysons Corner | Washington, D.C. | Wilmington

The relevant provisions of the Second Contract could not be more complete, clear or unambiguous. Article 4.1 provides that "[Eastman] shall sell and deliver to [Nestlé] at the Supply Locations and [Nestlé] agrees to purchase for each Year throughout the term of this Agreement, the quantities of Product(s) defined in Annex 4." Annex 4 provides: "Minimum Annual Quantities of ParaStar 2800 purchased by [Nestlé] will be at least 24,000,000 pounds for 2010."

The Second Contract does contain a requirement that Nestlé qualify *another* resin, the antimony-free equivalent to Eastman's PJ003 – it was ultimately called ParaStar 4800 and is used to make 5-gallon jugs – before Nestlé had to purchase that new resin in the minimum quantities contemplated by the Second Contract. In the event the replacement product was not qualified by a certain date, the Second Contract gave Nestlé the option to terminate any obligation to purchase PJ003 or its successor. The parties clearly knew how to write a qualification precondition but did not write one for ParaStar 2800.[1] Nestlé, thus, also runs afoul of the principel of contract interpretation that the expression of one excludes others. *Uribe v. Merchs. Bank of N.Y.*, 91 N.Y.2d 336, 340 (1998).

Nestlé may argue waiver: Eastman's efforts in 2010 to assist Nestlé and APT to "qualify" ParaStar 2800 excuse Nestlé's performance under the minimum purchase requirement.[2] This evidence too fails under New York rules of contract construction. There are no documents that establish actual waiver – Eastman's knowing and voluntary relinquishment of its rights under the Second Contract – and there are no written amendments to the Second Contract signed by both parties, as required under Article 16 of the Contract.

It is no wonder that Nestlé's expert testified that he was surprised not to see a qualification provision in the written contract. It is not a surprise. It was not the parties' agreement.

**Nestlé's Fraud Counterclaims are also Legally Deficient**
In its counterclaims, Nestlé alleges that Eastman fraudulently induced Nestlé to enter into the ParaStar 2800 obligations in the Second Contract by misrepresenting that ParaStar 2800 was a CPET resin when it really was ParaStar 7000 bottle resin relabeled in order to prevent Nestlé from insisting on bottle resin pricing. To prevail on its fraud and fraudulent inducement counterclaims, Nestlé must establish *by clear and convincing evidence* that (1) Eastman made a material false representation or omission, (2) Eastman intended to defraud Nestlé thereby, (3) Nestlé reasonably relied upon Eastman's representations or omissions, and (4) Nestlé suffered damage as a result of such reliance. Eastman denies any misrepresentation but this motion will address Nestlé's inability to establish reasonable reliance and materiality only.

Nestlé is a sophisticated party knowledgeable in the subject matter of the contract. It was represented by counsel and was fully capable of guarding itself against unwanted liabilities or obligations. Nestlé is one of the largest purchasers of CPET and bottle resins in the United States and the world. Although

---

[1] There is also a provision in the First Contract requiring the parties to qualify ParaStar 4000 for bottles and permitting Nestlé to terminate its obligations under the contract if qualification was not achieved.

[2] Nestlé has asserted some twenty affirmative defenses but, factually with regard to Count III, they are all based on facts purportedly relating to "qualification" or "waiver."

reasonable reliance does not require due diligence, Nestlé must show "minimal diligence" or care that "negat[es] its own recklessness." *Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997). Nestlé was required "to make an inquiry and investigation if [it] has the ability, through ordinary intelligence, to ferret out the reliability or truth about" the material facts. *Amusement Indus. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 U.S. Dist. LEXIS 8569, 34-36 (S.D.N.Y. 2013).

Nestlé did make some inquiry. In response to Nestlé's questions about Eastman's CPET resins, APT told Nestlé in 2008 and again, repeatedly, in 2009, as the Second Contract was being negotiated, that APT had tested ParaStar 2800 and that it did not work on APT's rotary lines, principally because it was a "co-polymer." (Bottle resins are "copolymers;" CPET resins are traditionally "homopolymers"). This information, and Eastman's ParaStar 2800 specifications, went to, among others, Eric Gorlier, Nestlé's "technical guru," who had a Ph.D. in polyester chemistry, had led Nestlé's testing of bottle resin ParaStar 4000 in 2006-07 prior to the First Contract and had a "very strong technical background in PET." He admitted at his deposition that he received this information from APT pre-contract and knew that co-polymers were typically bottle resins. Although Dr. Gorlier did not know whether CPETs were co-polymers, he testified that he did not use his technical knowledge or Nestlé's vast resources and testing facilities to investigate or test the resin.

Nestlé had sophisticated testing facilities in France, Switzerland and the United States. It could have easily figured out what ParaStar 2800 was if it was at all interested. The fact is, Nestlé was not concerned with the chemical composition of ParaStar 2800. Its documents show it was interested only in obtaining additional CPET sources for competitive pricing and continuity of supply purposes.

Nestlé had independent sources of information about ParaStar 2800 in 2009 before it signed the Second Contract but it ignored APT's negative comments and did no follow-up on the information it received. Its counterclaims for fraud and fraudulent inducement are not supported by any contemporaneous or even post-contract Nestlé documents. Rather, Nestlé's own documents show that its claims fail as a matter of law because Nestlé cannot prove that it reasonably relied on Eastman's representations or omissions regarding 2800, that Nestlé investigated contrary information from APT, or that Nestlé even cared.

**A Procedural Consideration**
Nestlé on November 27, 2013, served a motion to amend its answer and counterclaims to add a third counterclaim for breach of contract regarding ParaStar 2800. Eastman tomorrow will serve papers opposing that motion for, among other reasons, "futility:" there is no contractual requirement for "qualification" of ParaStar 2800 as a condition of sale. This is the same argument Eastman will make on summary judgment. Nestlé's motion to amend, under Judge Marrero's Order of Reference dated September 7, 2011, is returnable before Magistrate Judge Pitman. (A copy of the Order is attached.)

To expedite the consideration of both motions, assure consistency of decisions and shorten further pre-trial proceedings, Eastman respectfully suggests that the same judge hear both motions. Eastman is perfectly content to have that judge be Judge Pitman, but to eliminate the delays built into the Report and Recommendation procedure, Eastman respectfully suggests that the single judge be the District Judge.

Thank you for your consideration and attention to this matter.

Respectfully,

Marshall Beil

Enclosure

cc (by fax):   Hon. Henry B. Pitman
cc (by e-mail):  Harry H. Rimm, Esq.

52816761

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

EASTMAN CHEMICAL CO.

                                     Plaintiff(s),

- against -

NESTLE WATERS MANAGEMENT &
TECHNOLOGY      Defendant(s).

-------------------------------------------------------------- X

**ORDER OF REFERENCE
TO A MAGISTRATE JUDGE**

11 Civ. 2589 (VM)(HBP)

VICTOR MARRERO, United States District Judge.

The above entitled action is referred to the designated Magistrate Judge for the following purpose(s):

[X] General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement)

[ ] Specific Non-Dispositive Motion/Dispute:*
_____
_____

If referral is for discovery disputes when the District Judge is unavailable, the time period of the referral:_____

[ ] Settlement*

[ ] Inquest After Default/Damages Hearing

[ ] Consent under 28 U.S.C. §636(c) for all purposes (including trial)

[ ] Consent under 28 U.S.C.§636(c) for limited purpose (e.g., dispositive motion, preliminary injunction)

Purpose:_____

[ ] Habeas Corpus

[ ] Social Security

[X] Dispositive Motion (i.e., motion requiring a Report and Recommendation)

Particular Motion:_____

_____

[X] All such motions:

* Do not check if already referred for general pretrial.

The parties are directed that henceforth all correspondence pertaining to case management, scheduling and pretrial proceedings in this action, including amendments of an approved Case Management Plan, extensions of any deadlines, discovery disputes, non-dispositive pretrial motions, and any other proceedings prior to the completion of all discovery, shall be addressed to the designated Magistrate Judge in the first instance, except as may be otherwise authorized by the Court or the Magistrate Judge, and provided that with regard to matters referred to the Magistrate Judge on consent under 28 U.S.C. § 636(c), all such communications shall be addressed solely to the Magistrate Judge.

**SO ORDERED.**

DATED:      New York, New York
                7 September 2011

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/7/11

_____
VICTOR MARRERO
United States District Judge