

Sullivan & Worcester LLP
1633 Broadway
New York, NY 10019

T 212 660 3000
F 212 660 3001
www.sandw.com

December 10, 2013

**VIA ECF and EMAIL**
Honorable Katherine Polk Failla
United States District Judge
40 Foley Square
New York, New York 10007

      Re:    <u>Eastman Chemical Co. v. Nestlé Waters Mgmt. & Tech., 11 CV 2589 (KPF) (HBP)</u>

Dear Judge Failla:

    We write on behalf of defendant Nestlé Waters Management & Technology ("Nestlé") pursuant to Your Honor's November 13, 2013 Order and the Court's Individual Rules. The Amended Complaint alleges that Nestlé invoked a Competitive Price in twelve months (Count I) and threatened to invoke a Competitive Price in another ten months (Count II) that did not meet the contractual definition of a Competitive Price. *See* Am. Compl. ¶¶ 14, 15, 31, 34. The language from the Competitive Price provisions in the parties' two contracts is identical:

> Buyer may ask Seller to meet a fair competitive market-based price for like quality and quantity PET resin on a delivered price basis to similar regional Supply Locations . . . from a supplier of PET resins produced in NAFTA who has approved PET resins, and with whom Buyer has a current contract having a term of at least one (1) Year for a minimum volume of 100,000,000 pounds per Year.

First Supply Agreement, dated Mar. 30, 2007 (the "First Agreement"), Art. 5.3(a) & Second Supply Agreement, dated Sept. 30, 2009 (the "Second Agreement"), Art. 6.2(a) (collectively, the "Agreements"). After exhaustive fact discovery and the conclusion last week of the final expert deposition, plaintiff has failed to adduce evidence showing that Nestlé invoked or threatened a Competitive Price that was not in accord with the plain language of the Agreements.

**I.**    **COUNTS I AND II**

    In calculating the Competitive Price in some months, Nestlé factored in volume rebates expressly contained in its contracts with other suppliers. Plaintiff objects to this practice, but the Agreements plainly permit it.

    Each Supply Agreement states: "With respect to the calculation of a [Competitive Price], volume rebates *outside the contract* with the other NAFTA supplier or Asian supplier . . . shall not be included or applied in determining the competitive price." First Agreement, Art. 5.3(c) & Second Agreement, Art. 6.2(c). This language provides the parties' understanding of which rebates may not be included in the calculation of the Competitive Price. By stating which rebates should be excluded from determining the Competitive Price, the parties intended to *include* and apply volume rebates *within* contracts with other suppliers. Here, Nestlé produced its contracts with other suppliers during discovery, and, consistent with its contractual obligations, Nestlé applied only those volume rebates that were within the four corners of its contracts with these other suppliers.

BOSTON   NEW YORK   WASHINGTON, DC

Honorable Katherine Polk Failla
Page 2
December 10, 2013

For certain months, Nestlé also set the Competitive Price with plaintiff based on two-month or quarterly arrangements with its other customers. Plaintiff again can point to no provision in the Agreements that precludes this practice. When the parties wanted to specify a "monthly" price, they were explicit about it. *See, e.g.,* First Agreement, Art. 5.2 & Art. 5.8. This was not so in the Competitive Price provision quoted above. The only requirement is that the price be "market-based," meaning a price negotiated at arm's length in the market. The multi-month prices that Nestlé used were, indeed, market-based.

Finally, the Competitive Price provision has other words that are so hopelessly ambiguous that they are indefinite and unenforceable. Plaintiff may cite the phrases "*like* quality and quantity" and "*fair* competitive market-based price" to try challenge -- on faux technicalities -- the prices that Nestlé set. These terms, however, are so vague that there is no standard by which to determine if they have even been met. As such, the terms are unenforceable.

While we doubt that the adjectives "like" and "fair" could ever be given concrete meaning in the contractual setting, plaintiff has not even tried to clear up the ambiguity through extrinsic evidence. Plaintiff has adduced no industry custom, usage of trade, course of dealing or course of performance that could give meaning to these terms.

Summary judgment is appropriate to dispose of plaintiff's first two causes of action because the clear and unambiguous language of the Agreements allows for the reasonable pricing decisions that Nestlé made in setting the Competitive Prices. "Fair" and "like" are standardless terms, which cannot create after-the-fact hurdles that the parties did not and could not measure at the time of performance.

## II. COUNT II

Summary judgment also should be granted in favor of Nestlé on Count II because there is no evidence on which a jury could find Nestlé breached its duty of good faith and fair dealing. Plaintiff has failed to introduce evidence of improper motive or other indicia of bad faith. With one exception, in every month covered by Count II where Nestlé negotiated a price with plaintiff, Nestlé secured an offer from another supplier that was at or below the alleged "threat" price.

In addition, the record is clear that plaintiff was not actually threatened during pricing negotiations. For example, in September 2009, it was plaintiff that "threatened" to rely on the Competitive Price provision by writing to Nestlé: "We said that if we do not get to an agreement, we will have to look at the competitive." Moreover, plaintiff ran a highly sophisticated monthly pricing operation, collecting data and creating elaborate decision trees for its negotiation with Nestlé. Plaintiff clearly understood that Nestlé was simultaneously negotiating with other suppliers at the same time Nestlé was negotiating with plaintiff and, as a result, knew that Nestlé's prices had not yet been finalized and were simply forecasts for prices Nestlé expected to secure from other suppliers.

## III. ALLEGED DAMAGES

Plaintiff's calculation of alleged damages are based on the flawed assumption that the Agreements' liquidated damages provision for confirmatory audits applies to its claims for breach of contract. The Agreements provide that "[i]n the event that such confirmatory audit reveals that the [Competitive Price] . . . was in error, then [Nestlé] shall pay the costs of the audit

Honorable Katherine Polk Failla
Page 3
December 10, 2013

and shall pay to [plaintiff] the difference between [the] last offered price for the relevant period and the erroneous competitive price." First Agreement, Art. 5.3(d). Because plaintiff did not request a confirmatory audit in seventeen months and there was no finding of error in the other five months, plaintiff's damages, if any, should be limited to normal damages for breach of contract, which are intended to put a plaintiff in the position that it would have been in had the contract not been breached.

Plaintiff's alleged damages calculation under Count II is incorrect because plaintiff neither relies on the price it received nor the price it allegedly should have received. Plaintiff incorrectly assumes that the price it should have received was equal to its "last offer." Moreover, rather than relying on the price it actually received, plaintiff looks to the alleged quoted Competitive Price, which is lower than the price that plaintiff received in seven out of ten months. Plaintiff's approach is nothing more than double-dipping. Correcting this error alone reduces alleged damages by $2,547,812.07.

## IV.     COUNT III

In connection with Count III, plaintiff contends that Nestlé breached the Second Agreement by not purchasing ParaStar 2800 in 2010. *See* Am. Compl. ¶¶ 37-41. Nestlé intends to move for summary judgment on plaintiff's Count III; plaintiff cannot recover damages because there is no admissible evidence on which a jury could find that plaintiff had the capacity to produce the 24 million pounds at issue. In addition, at this juncture, Nestlé intends to move for summary judgment at least in connection with, but not necessarily limited to, its affirmative defenses, including, but not limited to, waiver.

With respect to waiver, and assuming breach, plaintiff had actual knowledge that Nestlé did not (i) furnish it with an estimate of its requirements for 2800 by volume at least 90 days prior to the beginning of 2010; (ii) in each month during 2010, submit to plaintiff an estimate of its 2800 requirement by volume for the following two months; (iii) before the end of each month during 2010, provide plaintiff with a firm order for its 2800 requirement by volume and location for the month; or (iv) purchase 2800 from plaintiff in 2010. Plaintiff, however, continued to perform under the Second Agreement without giving notice of any alleged breach to Nestlé, and, in fact, knowingly acquiesced in a course of dealing that indicated it was content with Nestlé not buying this resin. As a result, plaintiff voluntarily relinquished its right later to sue Nestlé.

## V.      EXPERTS

We are still awaiting receipt of and reviewing final deposition transcripts from four recent expert depositions and reserve the right challenge one or both of plaintiff's experts.

Respectfully yours,

*/s/ Harry H. Rimm*

Harry H. Rimm

cc:    Marshall Beil, Esq. (Via Email)